**sureUNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**DISH NETWORK L.L.C., ECHOSTAR**
**TECHNOLOGIES L.L.C. and**
**NAGRASTAR LLC,**

      **Plaintiffs,**

**v.**                                                                Case No:   6:14-cv-1443-Orl-31DAB

**ROBERT BAUDER,**

      **Defendant.**

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the following motion filed herein:

> **MOTION:**    **MOTION FOR DEFAULT JUDGMENT (Doc. No. 21)**
>
> **FILED:**       **November 6, 2014**
>
> _____
>
> **THEREON** it is **RECOMMENDED** that the motion be **GRANTED**.

Plaintiffs Dish Network L.L.C., Echostar Technologies L.L.C. And Nagrastar LLC (collectively "DISH Network"), seek entry of a default judgment against Defendant Robert Bauder, who allegedly has been circumventing DISH Network's security system and receiving DISH Network's satellite broadcasts of copyrighted television programming without payment of the required subscription fee. DISH Network seeks entry of judgment on Count III of the complaint which alleges violations of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1)(a)

and 2520, an award of statutory damages of $10,000, and a permanent injunction[1]. It is respectfully **RECOMMENDED** that the motion be **GRANTED**.

## I. Procedural History

DISH Network filed this action on September 4, 2014 alleging violations of the Digital Millennium Copyright Act, the Federal Communications Act, and the Electronic Communications Privacy Act. DISH Network served the summons and Complaint on Defendant on September 6, 2014. Doc. 15. Defendant failed to respond or otherwise defend this action despite being properly served with the Complaint, DISH Network moved for entry of default and the Clerk entered default on October 6, 2014. Doc. 20. DISH Network moved for default judgment against Defendant on November 6, 2014. Doc. 21. The matter is ripe for decision.

## II. Standard for Default Judgment

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise the clerk shall enter the party's default." Fed.R.Civ.P. 55(a). Thereafter, a judgment by default may be entered by the court. Fed.R.Civ.P. 55(b)(2).

The Court may award damages for default judgment without a hearing if "the amount claimed is a liquidated sum or one capable of mathematical calculations." *Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1543 (11th Cir. 1985). Under such circumstances, the record must "adequately reflect[] the basis for award via . . . demonstration by detailed affidavits establishing the necessary facts." *Id.* at 1544.The Court must confirm that the defaulting defendant was properly served under the Federal Rules of Civil Procedure.

---

[1] DISH Network intends to dismiss with prejudice its other claims, Count I for violation of the Digital Millennium Copyright Act and Count II for violation of the Federal Communications Act. *See* Doc. 21-1 at 14.

It is axiomatic that absent good service, the Court has no *in personam* or personal jurisdiction over a defendant. *Eastman Kodak Co. v. Studiengesellschaft Kohle mbH*, 392 F.Supp. 1152 (D. Del. 1975). A federal trial court has an affirmative duty to examine its jurisdiction over the parties when entry of judgment is sought against a party who has failed to plead or otherwise defend. *Williams v. Life Savings and Loan*, 802 F.2d 1200 (10th Cir. 1986). Without personal service of process in accordance with applicable law, a federal court is without jurisdiction to render a personal judgment against a defendant. *Royal Lace Paper Works, Inc. v. Pest-Guard Products, Inc.*, 240 F.2d 814 (5th Cir. 1957).

Under Rule 4(e), service of a federal complaint on an individual is accomplished in accordance with the procedure for service under the applicable state law or by delivering a copy of the summons and of the complaint to the individual personally. Fed. R. Civ. P. 4(e). In this case, a copy of the summons and the Complaint were served on Robert Bauder personally at his address of 59 Dorset Drive, Kissimmee, Florida 34758. Doc. 15. Plaintiffs submitted evidence that Defendant is not an infant, not an incompetent person, and not on active duty in the military or otherwise exempted under the Service Members' Civil Relief Act.

### III. Background Facts

DISH Network filed this action on September 4, 2014 and default was entered on October 6, 2014. Docs. 1, 20. In defaulting, a defendant "admit[s] the plaintiff's well-pleaded allegations of fact" for purposes of liability. *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987).

Based on evidence it obtained in an investigation showing Defendant Robert Bauder intercepted the copyrighted satellite television programming broadcast by DISH Network in part by subscribing to a pirate television service known as Nfusion Private Server ("NFPS"), DISH Network confirmed that Defendant illegally obtained DISH Network's control words or "keys," which he

then used to decrypt DISH Network's satellite signal and view DISH Network programming without authorization.  Doc. 1 ¶ 8.

DISH Network L.L.C. is a multi-channel video provider that delivers video, audio, and data services to approximately 14 million customers throughout the United States, Puerto Rico, and the U.S. Virgin Islands via a direct broadcast satellite system. *Id.* ¶ 9[2].  DISH Network uses high-powered satellites to broadcast, among other things, movies, sports, and general entertainment services to consumers who have been authorized to receive such services after payment of a subscription fee, or, in the case of a pay-per-view movie or event, the purchase price. *Id.* ¶ 10.

DISH Network contracts for and purchases the distribution rights for most of the programming broadcast on the DISH Network platform from providers such as network affiliates, motion picture distributors, pay and specialty broadcasters, cable networks, sports leagues, and other holders of programming rights. *Id.* ¶ 11.  The works broadcast by DISH Network are copyrighted, and DISH Network has the authority of the copyright holders to protect the works from unauthorized reception and viewing. *Id.* ¶ 12. DISH Network programming is digitized, compressed, and scrambled prior to being transmitted to multiple satellites located in geo-synchronous orbit above Earth; the satellites, which have relatively fixed footprints covering the United States and parts of Canada, Mexico, and the Caribbean, relay the encrypted signal back to Earth where it can be received by DISH Network subscribers that have the necessary equipment. *Id.* ¶ 13.

A DISH Network satellite television system consists of a compatible dish antenna, receiver, smart card which in some instances is internalized in the receiver, television, and cabling to connect the components. *Id.* ¶ 14. EchoStar Technologies L.L.C. provides receivers, dish antenna, and other digital equipment for the DISH Network system. Smart cards and other proprietary security

---

[2] The technology described in the allegation of the Complaint, in addition to being uncontroverted, is supported by the Declarations of Mr. Duval and Mr. Rogers. Docs. 21-2, 21-3.

technologies that form a conditional access system are supplied by NagraStar LLC. *Id.* Each EchoStar Technologies receiver and NagraStar smart card is assigned a unique serial number that is used by DISH Network when activating the equipment and to ensure the equipment only decrypts programming the customer is authorized to receive as part of his subscription package and pay-per-view purchases. *Id.* ¶ 15. The NagraStar conditional access system performs two interrelated functions in the ordinary course of its operation: first, subscriber rights management, which allows DISH Network to "turn on" and "turn off" programming a customer has ordered, cancelled, or changed; and second, protection of the NagraStar control words that descramble DISH Network's satellite signal, which in turn prevents unauthorized decryption of DISH Network programming. *Id.* ¶ 16.

An integral part of NagraStar's conditional access system is a smart card having a secure embedded microprocessor. *Id.* ¶ 17. The EchoStar Technologies receiver processes an incoming DISH Network satellite signal by locating an encrypted part of the transmission known as the NagraStar entitlement control message and forwards it to the smart card. *Id.* Provided the subscriber is tuned to a channel he is authorized to watch, the smart card uses its decryption keys to unlock the message, uncovering a NagraStar control word. The control word is then transmitted back to the receiver to decrypt the DISH Network satellite signal. *Id.* Together, the EchoStar Technologies receiver and NagraStar smart card convert DISH Network's encrypted satellite signal into viewable programming that can be displayed on the attached television of an authorized DISH Network subscriber. *Id.* ¶ 18.

Various devices have appeared on the black market over the years for the purpose of illegally decrypting or "pirating" DISH Network programming, and the black market in piracy devices represents a multimillion-dollar industry in the United States. *Id.* ¶ 19. Several years ago pirates developed a method to circumvent the DISH Network security system and intercept DISH

Network's satellite broadcasts using so-called "free-to-air" or "FTA" receivers ("unauthorized receivers"). *Id.* ¶ 20. Initially, this method of piracy was accomplished by loading software that contains the proprietary data and keys to DISH Network's security system ("piracy software") onto circuit chips in the unauthorized receiver, so as to mimic a legitimate NagraStar smart card. *Id.*

The downside of the foregoing method of signal theft is that piracy software must be regularly updated to account for and overcome changes in DISH Network's security system, such as electronic countermeasures transmitted in the satellite stream. *Id.* ¶ 21. The countermeasures have many effects, one being to change the decryption keys required to access NagraStar's control words. As a result, a new form of satellite piracy emerged and goes by several names including "control word sharing," "Internet key sharing," or more simply "IKS." *Id.* With IKS, once piracy software is loaded onto an unauthorized receiver, the end user connects the receiver to the Internet via a built-in Ethernet port or an add-on dongle. *Id.* The Internet connection serves two important piracy-related purposes: first, it automatically updates piracy software on the receiver; and second, the Internet connection contacts a computer server that provides the necessary NagraStar control words. *Id.* ¶ 22.

The computer server, called an "IKS server," has multiple, subscribed NagraStar smart cards connected to it, and thus the ability to provide the control words. *Id.* ¶ 23. Access to an IKS server typically requires a valid passcode. *Id.* Once access has been obtained, control words are sent from the IKS server over the Internet to an unauthorized receiver, where they are used to decrypt DISH Network's signal and view programming without paying a subscription fee. *Id.* Because IKS is based on the unauthorized distribution of control words obtained from genuine, subscribed DISH Network receiving equipment, this method of piracy remains effective even after DISH Network's transition to "Nagra 3," the latest generation security technology introduced by NagraStar. *Id.* ¶ 24. NFPS is a subscription-based IKS service, whereby members purchase a subscription to the IKS service to

obtain the control words that are used to circumvent the DISH Network security system and receive DISH Network's satellite broadcasts of television programming without authorization. *Id.* ¶ 25.

Francis Philip, a/k/a Vgiddy and fphilip@computan.com, sold subscriptions to NFPS. *Id.* ¶ 26. Philip provided DISH Network with copies of his business records pertaining to Defendant, and Philip's records show that Defendant purchased one year subscriptions to NFPS on or about December 11, 2011 and December 6, 2012. *Id.* Defendant accessed NFPS using an unauthorized receiver loaded with piracy software, so that each time Defendant tuned his unauthorized receiver to an encrypted DISH Network channel, the receiver requested the control word for that particular channel from the NFPS server. *Id.* The NFPS server returned the control word to Defendant, and Defendant used the control word to decrypt DISH Network's satellite signal and view DISH Network programming without having to purchase a subscription. *Id.* ¶ 27.

Defendant's actions cause actual and imminent irreparable harm for which there is no adequate remedy at law. *Id.* ¶ 28. Through IKS piracy, Defendant enjoys unlimited access to DISH Network programming, including premium and pay-per-view channels, causing lost revenues that cannot be fully calculated. *Id.* In addition, Defendant's actions damage the business reputations and goodwill of DISH Network, EchoStar Technologies, and NagraStar, and result in the need for costly security updates and legal actions aimed at stopping satellite piracy. *Id.*

As is clear from the allegations above, Defendant purchased multiple subscriptions to the NFPS service and used this service to intercept DISH Network programming. The records provided by Philip during DISH Network's investigation establish that Defendant purchased four subscriptions to NFPS using PayPal on December 11, 2011 and December 6, 2012. Doc. 21-3, Rogers[3] Decl. ¶ 6(a)-(e), Exs. 1-5. For these subscriptions, Defendant was assigned a passcode to

---

[3] Mr. Rogers is the founder and principal of Digital Evidence International, Inc. ("DEI"), who is retired from the Royal Canadian Mounted Police in the tech crime section. Doc. 21-3. He is personally familiar with the

access the NFPS service. Id. NFPS is strictly a piracy service and has no legitimate aspect of its business. Doc. 21-2, Duval[4] Decl. ¶ 17.

There is also evidence that Defendant used the NFPS subscriptions to illegally receive DISH Network programming. According to records maintained by Philip, Defendant went by the username "Robert516" at the website www.ftazeta.com ("Ftazeta"). Rogers Decl. ¶ 6(e), Ex. 5. On January 7, 2013, Defendant, in a forum entitled "Issues with NFPS service", makes a post on the Ftazeta website discussing problems with connecting to NFPS and states, "I was up last night with minor freezing today I have nothing." *Id*. ¶ 7(a), Ex. 6. In the same forum on February 15, 2013, members of Ftazeta were discussing their inability to connect to NFPS and Defendant stated he was "up and running good now for me for over an hour and half." *Id.* ¶ 7(b), Ex. 7. Defendant's post indicates that the NFPS service was working at times for Defendant.

Although there is evidence that Defendant purchased multiple subscriptions to the NFPS service and that Defendant was using the NFPS service to intercept DISH Network programming, the exact period of time the Defendant used NFPS to steal DISH Network programming cannot be determined from the evidence now available.

**IV. Liability under the ECPA**

Under the Electronic Communications Privacy Act ("ECPA"), any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any … electronic communication ... shall be subject to suit as provided in subsection (5)." FN1 § 2511(1)(a). Subsection (5) refers to § 2520, which allows for a private right

---

investigation into Francis Phillip and the evidence obtained from him, including the subscriptions sold to a pirate television service called Nfusion Private Server, which led to the evidence against Defendant who purchased an NFPS subscription from Phillip.  *Id*.

[4] Mr. Duval is the Chief Operating Officer with Plaintiff NagraStar LLC, the supplier of the proprietary encryption technology used by Plaintiffs DISH Network LLC and Exho Star Technologies LLC.  Doc. 21-2.  His Declaration provides a detailed explanation of the how the encryption system works. *Id*.

of action against all who violate § 2511.  Encrypted broadcasts of satellite television programming, such as those transmitted by DISH Network, constitute "electronic communications" under the ECPA. *See DISH Network L.L.C. v. DelVecchio*, 831 F.Supp.2d 595, 598 (W.D.N.Y.2011) (collecting cases); *see also DirecTV Inc. v. Nicholas*, 403 F.3d 223, 225 (4th Cir. 2005) ("It is undisputed that satellite television transmissions constitute electronic communications under § 2510(12)"); *United States v. Herring,* 993 F.2d 784, 787 (7th Cir. 1993) (finding Congress contemplated interception of satellite television programming by ECPA's protections for electronic communications); *United States v. Lande*, 968 F.2d 907, 909-10 (9th Cir. 1992) (finding that interception of satellite signals constituted a violation of § 2511 because satellite signals are electronic communications under the ECPA).

The ECPA provides that a plaintiff in a civil action may recover "from the person or entity . . . which engaged in [a] violation such relief as may be appropriate." § 2520(a). It further provides that appropriate relief may include "equitable or declaratory relief" and damages as provided under the statute. *Id.* at (b).  In their motion for default judgment, the plaintiffs seek statutory damages under the ECPA in the amount of $10,000 as well as a permanent injunction.

In this case, Defendant purchased NFPS subscriptions, which he used to misappropriate DISH Network's proprietary control words and intercept DISH Network's signal. To access the NFPS server, Defendant used an unauthorized receiver that had been purposefully loaded with piracy-enabling software, and each time the receiver was tuned to an encrypted DISH Network channel, the control word was requested from the NFPS server. In response, the NFPS IKS server provided the control word, which automatically descrambled DISH Network's satellite signal and enabled Defendant to view DISH Network programming without authorization. Defendant's acts in the satellite interception deliberate acts directed at exploiting the NFPS IKS service, and in no way can be deemed accidental. DISH Network has established that Defendant's intentional interception

of DISH Network's satellite signal violates the ECPA. *See DISH Network L.L.C. v. DelVecchio*, 831 F. Supp. 2d 595, 599 (W.D.N.Y. 2011); *see also DISH Network L.L.C. v. Rounds*, No. 11-241, 2012 WL 1158798, at *3 (W.D. Pa. Apr. 6, 2012) (granting motion for default judgment and finding that DISH Network's complaint stated a violation of section 2511(1)(a)).   The Court now turns to the relief sought.

### VI. Statutory Damages

DISH Network contends that it should be awarded $10,000 in statutory damages for Defendant's violations of the ECPA. When "arriving at the judgment amount involves nothing more than arithmetic—the making of computations which may be figured from the record—a default judgment can be entered without a hearing of any kind." *HMG Property Investors, Inc. v. Parque Indus. Rio Canas, Inc.*, 847 F.2d 908, 919 (1st Cir. 1988) (citing *Pope v. United States*, 323 U.S. 1, 65 S.Ct. 16, 89 L.Ed. 3 (1944)); *see also Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2nd Cir. 1997) ("We have held that under Rule 55(b)(2) it [is] not necessary for the District Court to hold a hearing as long as it ensured that there was a basis for the damages specified in the default judgment") (internal citations and quotations omitted); *James v. Frame (In re Frame)*, 6 F.3d 307, 309–11 (5th Cir.1993) (accord); *United States v. Ford 250 Pickup 1990*, 980 F.2d 1242, 1246 (8th Cir. 1992) ("Federal Rule of Civil Procedure 55(b)(2) requires a hearing only if the court deems it necessary and proper to enable the court to enter default judgment"); *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir.1983) ("A judgment by default may not be entered without a hearing on damages unless ... the amount claimed is liquidated or capable of ascertainment from definite figures contained in documentary evidence or in detailed affidavits") (internal citations omitted); *Davis v. Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981) ("It is well settled that a default judgment for money may not be

entered without a hearing unless the amount claimed is a liquidated sum or capable of mathematical calculation") (internal citation omitted).

Section 2520(c)(2) of the ECPA authorizes statutory damages where a scrambled or encrypted electronic communication has been intentionally intercepted. *See* 18 U.S.C. § 2520(c)(1)-(2). The statute sets statutory damages at the greater of: "(A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or (B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000." 18 U.S.C. § 2520(c)(2). DISH Network cites several cases to the effect that the Court has discretion in determining whether to award damages, "but the plain language of the statute does not . . . authorize the Court to grant anything other than the damages permitted by the statute." Doc. 21 at 5 (quoting *DelVecchio*, 831 F. Supp. 2d at 601, *and DirecTV, Inc. v. Huynh*, 318 F. Supp. 2d 1122, 1132 (M.D. Ala. 2004) ("The court has discretion whether to award damages at all . . . but the court, if it decides to award damages, has no discretion as to the amount.")).[5]

Several courts have considered a list of factors to determine whether to award statutory damages pursuant to the ECPA: "the severity or minimal nature of the violation; whether there was actual damage to the victim; the extent of any intrusion into the victim's privacy; the relative financial burdens of the parties; whether there was a reasonable purpose for the violation; and whether there was any useful purpose to be served by imposing the statutory damages amount." *See, e.g., DirecTV, Inc. v. Rawlins*, 523 F.3d 318, 325-26 (4th Cir. 2008) (citing *Nalley v. Nalley*, 53 F.3d 649, 654 (4th Cir. 1995)). The court should additionally consider whether the defendant profited from the interception; and whether the defendant has already been punished in some other

---

[5] There are several cases which hold that when a satellite broadcasting provider alleges claims under both the FCA and the ECPA, it is not an abuse of discretion to award statutory damages under the FCA, which may be as low as $1,000, and decline to award additional damages under the ECPA for the same conduct. *See, e.g., Dish Network LLC v. Tendler*, 2015 WL 400869, *4 (D.N.H. Jan. 28, 2015) (citing cases but holding that, where the broadcaster has moved for default judgment only on the ECPA claim, they are entitled only to the remedies under the ECPA).

proceeding." *DirecTV, Inc. v. Griffin*, 290 F. Supp. 2d 1340, 1348 (M.D. Fla. 2003) (citing *Goodspeed v. Harman*, 39 F. Supp. 2d 787, 791 (N.D. Tex. 1999)).

DISH Network argues that these factors demonstrate that Defendant should be held liable for damages of $10,000. Based on the allegations in the Complaint, admitted upon Defendant's default, he concedes that he purchased multiple subscriptions to the NFPS service and used this service to intercept DISH Network programming without a subscription by using an unauthorized receiver; Defendant had also made posts on satellite television piracy forums suggesting that he had been unlawfully intercepting DISH Network programming.

DISH Network has presented sufficient evidence that is suffers actual harm from the theft of DISH Network programming. Despite having invested millions of dollars in security measures designed to prevent piracy, the IKS method of piracy at issue here damages the reputations and goodwill of all three Plaintiffs and was used by Defendant to circumvent the latest security technology developed by DISH Network. Thus, Defendant's piracy forced Plaintiffs to spend more time, effort, and money developing additional security measures.  Defendant's participation in this type of IKS piracy also leads to lost programming revenues and lost profits that are customarily gained from the sale of subscription packages and equipment to authorized DISH Network subscribers. DISH Network's average monthly revenue per authorized subscriber is approximately $84.

As to the relative financial burdens on each party, this factor favors DISH Network. In addition to those expenses previously discussed, the loss to DISH Network includes the expense of pursuing this case, which consumes the time of its employees and requires retention of outside investigators and counsel to enjoin Defendant from intercepting DISH Network programming in violation of the ECPA. There is no evidence in the record concerning Defendant's financial situation.  For the subscription fee alone, $84 per month- not including the premium and pay per

view pirated programs, which are significantly higher - Defendant has cost DISH Network $1,000 on an annual basis; Defendant had two subscriptions per year for a minimum of two years, or a net subscription loss to DISH Network of $4,000. The $10,000 statutory penalty is (at most) 2.5 times the loss to DISH Network.

Defendant has failed to defend the claims against him or put forth any justification for his violation of the ECPA, nor is it likely he could assert a justification for pirating a satellite signal. *See, e.g., Craig*, 361 F. Supp. 2d at 1344 (finding the record devoid of any justification for defendant's actions, and observing that "pirate access devices rarely serve a legitimate purpose beyond stealing satellite signals");*cf. DIRECTV, Inc. v. Griffin*, 290 F.Supp.2d 1340 (M.D.Fla.2003) (evidence showed that the defendant obtained pirate access devices to test security systems installed by his company, not to steal programming). DISH Network has not previously sued Defendant to hold him liable for the actions which are the basis of this suit, thus, Defendant's acts of illegally pirating DISH Network programming without paying the required subscription fee have gone unpunished. Overall, the factors weigh in favor of awarding Plaintiffs $10,000 in statutory damages.

It is respectfully **RECOMMENDED** that Plaintiffs be awarded statutory damages of $10,000 for Defendant's violation of the ECPA. Awarding statutory damages under the ECPA in this case will serve the purpose of not only compensating the plaintiffs for their losses, but will also act as a deterrent for Defendant and others to not engage in the theft of DISH Network programming. *See DISH Network L.L.C. v. Main*, No. 8:11-cv-1861-EAK-TGW (M.D. Fla. Oct. 11, 2011) at Doc. 13; *see also DISH Network L.L.C. v. Bradley*, No. 0:13-cv-61918-JLC (S.D. Fla. Feb. 7, 2014) at Doc. 11; *DISH Network L.L.C. v. Sweeting*, No. 1:11-cv- 140-WLS (M.D. Ga. Aug. 31, 2012) at Doc. 13; *DISH Network L.L.C. v. Powell*, No. 2:12-cv-212-WHA-WC (M.D. Ala. May 8, 2012) at Doc. 12*; DISH Network L.L.C. v. Pippin*, No. 5:11-cv-282-RS-EMT (N.D. Fla. Nov. 8, 2011) at Doc. 11; *Craig*, 361 F. Supp. 2d at 1344 (awarding $10,000 pursuant to the ECPA despite plaintiff's

incapacity to demonstrate defendant profited from his violation or actually used his piracy device); *cf. Christomos*, 2004 WL 2110700 (awarding no damages under the ECPA when there was no evidence that the defendant ever used or owned a receiver, let alone accessed programming without authorization); *DIRECTV, Inc. v. Taylor*, No. 03–6126–HO, 2004 WL 1878337 (D.Or. Aug.19, 2004) (no evidence that defendant used pirate access devices or had access to programming).

### VII. Permanent Injunctive Relief

The ECPA authorizes courts to grant appropriate relief including equitable or declaratory relief as may be appropriate. § 2520(b)(1). The criteria for the issuance of a permanent injunction requires a plaintiff demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

The court finds that Defendant's piracy of DISH Network's service has caused Plaintiffs to suffer irreparable injury. *See, e.g., DISH Network L.L.C. v. New Era Elec. Corp.*, No. SACV 12–1097 DOC (JPRx), 2013 WL 5486798, at *7 (C.D.Cal. Sept. 27, 2013). Plaintiffs provide copyrighted, subscription-based satellite television programming. (Duval Decl. ¶¶ 5-10.) The companies invest millions of dollars each year in the security measures that protect DISH Network programming. Piracy, however, undermines the investment in the technology and results in the need for costly security updates. For example, the IKS method of piracy engaged in by Defendant is designed to circumvent the "Nagra 3" security technology most recently introduced by DISH Network, which took approximately 18 months to implement and had an estimated cost of more than $100 million. In addition, anti-piracy countermeasures are continually being developed and released in the DISH Network satellite stream, at significant expense, to prevent persons like

Defendant from stealing DISH Network programming. Plaintiffs' business reputations also suffer from piracy, which interferes with contractual and prospective business relationships of the companies, including relationships with programming providers and customers for set-top boxes and security system solutions; calculating the reputational damage and lost sales due to piracy is inherently difficult, if not impossible, and therefore constitutes irreparable harm.

The Eleventh Circuit has recognized that loss of goodwill, loss of ability to control business reputation, and lost profits each constitute irreparable harm. *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs.*, LLC, 425 F.3d 964, 970 (11th Cir. 2005) ("the loss of customers and goodwill is an irreparable injury") (quoting *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)); *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 190 (11th Cir. 2005) ("[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill").

In addition, the money damages provided for above, while significant, are inadequate to prevent future piracy without injunctive relief. *See, e.g., Gonzalez*, 2013 WL 2991040, at *10. The balance of hardships and public interest favor injunctive relief. There is no hardship to Defendant, other than preventing him from engaging in unlawful activity. Therefore, the balance clearly weights in the plaintiffs' favor. In addition, the public interest would be served by protecting copyrights and aiding the enforcement of federal law. *See Coxcom, Inc. v. Chafee*, 536 F.3d 101, 112 (1st Cir. 2008); *Whitcomb*, 2011 WL 1559825, at *4 (recognizing strong public interest in having anti-piracy legislation enforced) (citing *Coxcom*, 536 F.3d at 112). The Court finds the criteria for a permanent injunction have been met. Accordingly, DISH Network is entitled to a permanent injunction enjoining Defendant from circumventing or assisting others in circumventing DISH Network's security system to intercept DISH Network's satellite signal and extracting codes or information from DISH Network's satellite receivers or other components of the DISH Network security system.

It is respectfully **RECOMMENDED** that Plaintiffs' Motion for Default Judgment (Doc. 21) on Count III of the Complaint be **GRANTED**, and Plaintiffs' be awarded statutory damages under the ECPA of $10,000 against Defendant Bauder and permanent injunctive relief as set forth above.

Plaintiffs are **DIRECTED** to file their notice dismissing Counts I and II with prejudice and a Proposed Default Judgment[6] setting forth the injunctive relief **within 14 days of entry of this Report and Recommendation.**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on March 12, 2015.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy

---

[6] *See DISH Network L.L.C. v. Main*, No. 8:11-cv-1861-EAK-TGW (M.D. Fla. Oct. 11, 2011) at Doc. 11-2.